OPINION OF THE COURT
Ira P. Block, J.
In this prosecution for driving while intoxicated (Vehicle and Traffic Law § 1192 [2], [3]), the court has conducted a hearing to determine whether the Intoxilyzer 5000 is sufficiently reliable to permit the admissibility of its test results. The Intoxilyzer 5000 is used to determine the blood alcohol concentration of the defendant’s blood.
The expert witnesses and their backgrounds are summarized as follows:
*764 James Witler is the coinventor of the Intoxilyzer 5000 and the director of engineering for CMI, Inc. of Minturn, Colorado (the wholly owned subsidiary of Federal Signal Corporation of Oakbrook, 111., the manufacturer of the Intoxilyzer 5000). Mr. Witler planned, directed and coordinated the engineering, research and development of the machine, and supervises the repair of existing products.
Dr. Arthur Flores is the project director for the Office of Alcohol Countermeasures for the National Highway Traffic Safety Administration in Cambridge, Massachusetts. He holds a doctorate in physical chemistry, and his principal responsibility with respect to the Intoxilyzer 5000 is to conduct tests, both those that were established pursuant to the National Bureau of Standards, and other tests of a more informal nature, in an effort to determine the reliability of the Intoxilyzer 5000.
Dr. Leo Dalcortivo of the office of the Medical Examiner of Suffolk County holds the positions of director of laboratory services and chief toxicologist. Associated with that office since 1960, Dr. Dalcortivo was formerly the senior toxicological chemist and holds a doctorate in chemistry.
The final witness was Police Officer James McCarthy, who has been with the Suffolk County Police Department for 15 years and is currently with the breath test section of the department. He is the technical supervisor of the unit and teaches the operators how to use the breath test equipment. He also checks the instrument to ascertain if the instrument is working properly, turns the instrument on, and does the diagnostic checks. In general, his unit handles the calibration of the breath testing equipment.
Based on the testimony of these witnesses, the court makes the following findings regarding the workings and reliability of the Intoxilyzer 5000:
WORKINGS OF THE INTOXILYZER 5000
The Intoxilyzer 5000 uses an infra-red light beam passed through a chamber containing a sample of the subject’s breath in order to determine the concentration of ethyl alcohol in that subject’s blood. When the machine is turned on, it automatically purges the sample chamber, heats to 45 degrees centigrade, and indicates its readiness. The operator pushes a button and inserts a card. By way of control, fresh air is introduced and analyzed to obtain a reference for the test of the subject’s breath. Next, the subject blows into the sample *765 chamber, which holds 81 cubic centimeters of air and is bounded by two lenses. He must blow for four seconds at a sufficient pressure to insure that there is no "mouth alcohol” that could be detected by the machine. The slope of alcohol concentration in the breath is highest at the beginning stages of the test. Thereafter, the slope levels off and approaches 0% of change.
The breath analysis, which occurs once the slope has leveled off, involves the principle of "infra-red spectroscopy.” An infra-red source lamp projects infra-red rays directly through the sample chamber, where they interact with the subject’s breath sample. The rays are then channeled through a filter wheel which filters out all hydrocarbons which are not the subject of the test, to wit, everything except ethyl alcohol. An infra-red energy detector then picks up the infra-red rays. A reading of the alcohol concentration appears on a digital display terminal and is printed on the card, and the machine automatically purges itself. As a further control, air from a connected simulator is then introduced into the chamber and tested. Once the result is printed on the card, the machine again purges itself. This entire procedure takes about 95 seconds.
CHEMICAL TEST OR CHEMICAL ANALYSIS
Section 1192 (2) of the Vehicle and Traffic Law speaks of the chemical analysis of a person’s blood, whereas Vehicle and Traffic Law § 1194 speaks of the chemical test of a person’s breath, blood, urine or saliva for the purpose of determining alcohol or drug content of his blood. It would appear that these terms have been used synonymously, and, therefore, this court will treat them as if they are synonymous.
There is a threshold question raised with regard to whether the Intoxilyzer 5000 testing procedure constitutes a chemical test/chemical analysis as contemplated by the New York State Legislature. In support of a bill previously submitted in the New York State Senate, the observation is made that, "The Breathalyzer involves test solutions and a 'chemical test’ of the driver’s breath. Currently, police departments are purchasing and are using various instruments which employ techniques such as infra-red analysis rather than chemical techniques. These new instruments, such as the CMI [I]ntoxilyzer and the Smith and Wesson Model 2000, are extremely accurate and reliable. Courts have construed these new instruments as not involving 'chemical tests’ under sections 1194 *766 and 1195 of the [Vjehicle and [T]raffic [L]aw.” (Sen Kehoe, mem in support, S 3106, 1987-1988 Regular Sess.)
Moreover, courts of other States have held that the results of various Intoxilyzer models are admissible as a chemical test/chemical analysis (see, State v Moore, 307 A2d 548 [Del Super Ct]; Dollar v State, 287 Ark 153, 697 SW2d 93; Curry v State, 522 So 2d 887 [Fla Dist Ct App]), and the undisputed testimony at the hearing before this court was that a chemical reaction indeed occurs in the sample chamber of the Intoxilyzer 5000 when the infra-red rays interact with the breath sample. The molecules of alcohol absorb the energy of the infra-red radiation. Consequently, this court finds that the Intoxilyzer 5000 testing procedure is a chemical test/chemical analysis within the meaning of Vehicle and Traffic Law § 1194 (see also, People v Jones, 118 Misc 2d 687 [Intoximeter 3000]).
RELIABILITY OF THE INTOXILYZER 5000
The Intoxilyzer 5000 has appeared on the Conforming Products List of Evidential Breath Measurement Devices of the United States Department of Transportation/National Highway Traffic Safety Administration. This list has been adopted by the Commissioner of the New York State Department of Health.[1]
In 1984, the United States Department of Transportation promulgated rules and regulations for the testing of machines that analyze the alcoholic content of the breath. A manufacturer is required to submit at least one unit of its equipment to the offices of the National Highway Traffic Safety Administration in Cambridge, Massachusetts. The manufacturer is responsible for insuring that the machine is properly calibrated and operating properly. The machine is tested by a BASS method, that is, a breath alcohol sample simulator, which insures that there is a uniformity for all samples tested.
The testing is conducted at .05%, .101% and .151% blood alcohol content (hereinafter BAG), the Department of Transportation noting that no State has a higher BAG level than .15% for the determination of intoxication. The instrument must have a deviation within .0042% for precision, and an accuracy of +/— .005% BAG or +/— 5% of the gross reading, whichever is greater.
*767 Dr. Flores testified that the Intoxilyzer 5000 has been tested and found to be accurate. As for precision and accuracy, the machine is within 3 to 4%, and, therefore, the deviation is within the standard. Various types of gases had been submitted to the machine (carbon dioxide, carbon monoxide, oxygen, and nitrogen) in an attempt to duplicate human breath. Breath samples corresponding to high, medium, and small vitality capacities were used, in order to see whether alveolar (or "deep lung”) air was being sampled, and the Intoxilyzer was well within the 5% variation. The Intoxilyzer was tested for variations in input power, with 115V being the norm. Tests were run at 108V and 123V and the instrument met the requirement of +/— 5%. The machine was run at 20 degrees centigrade ambient temperature and 30 degrees centigrade ambient temperature and it continued to meet the +/— 5% variation requirement. A vibration test was performed to determine whether the instrument could be used within a police car. The machine was vibrated from 10 cycles per second to 60 cycles per second. Ten tests were performed and the instrument was still within the 5% variation. Inspections for electrical safety were conducted and no electrical hazards were found. The Intoxilyzer was also tested to determine its response to acetone, which is the closest hydrocarbon to alcohol. The test revealed that the Intoxilyzer 5000 will differentiate between alcohol and acetone because of the different rates at which these two substances absorb infra-red energy. Dr. Dalcortivo has experimented with the Intoxilyzer 5000 to determine whether other materials would be detected, putting various household products through the machine. He tested, inter alia, gasoline, kerosene, turpentine, diesel fuel, lacquer thinner, furniture cleaner, and paint thinner, and found that the Intoxilyzer differentiated between these substances and ethyl alcohol.
In addition to the above-described tests, testimony was received demonstrating that the Intoxilyzer 5000 has been constructed with built-in safeguards against an inaccurate reading. If mouth alcohol is being detected, there will be a very rapid rise in the curve on the slope detector, followed by a quick drop-off. In such a case, the machine will reflect "Invalid Test” on the card. Should there be ambient contamination, i.e., if alcohol is present in the room, the machine will indicate the problem. The machine will likewise indicate "Invalid Test” if there is an insufficient breath sample. It also has a built-in detector to determine the presence of radio *768 frequency interference and an internal check to insure that there are no processor errors. If the temperature in the sample chamber is too cool or too warm, or varies during the course of the test, the machine has been programmed to indicate either "Temperature Error” or "Not Ready”. There is a central processing unit built into the machine, which monitors the machine’s internal functioning. The machine is also equipped with RAM (Random Access Memory), which goes through an operational checklist prior to indicating that the machine is ready for operation.
By reason of the above-described testimony, therefore, evidence has been received as to the nature, function and underlying scientific principles of the Intoxilyzer 5000, enabling this court to make a finding as to the scientific reliability of the machine and its processes and, hence, to determine the admissibility of the machine’s test results in this case.
CONCLUSION
After hearing and evaluating all of the testimony received at the instant hearing, this court finds that the infra-red molecular absorption process used in the Intoxilyzer 5000 is generally accepted in its particular scientific field and has achieved general acceptance within the scientific community. As such, this court is of the opinion that the Intoxilyzer 5000 is a scientifically reliable machine for the testing of BAG.[2] *769 However, the People must still lay the foundation for the introduction of the test results provided by this instrument. As with a breathalyzer, they must show that the test was given by an authorized individual and that the machine was in good working order. For example, the certificates as to calibration of the machine and its maintenance must be introduced.
This matter is scheduled for trial on September 1, 1988 in room 401.

. Other instruments on the list that use infra-red energy have been held reliable in this State (People v Jones, 118 Misc 2d 687; People v Drumm, 122 Misc 2d 1051 [Intoxilyzer 4011AS]; contra, People v Kester, 130 Misc 2d 37).

. Although an abnormal body temperature may affect the BAG reading given by the machine, this court is of the opinion that the issue of whether a reading in a particular case was affected by an abnormal temperature is an issue to be raised by the defendant and determined by the trier of fact at trial (cf., People v Tilley, 120 Misc 2d 1040).
The court also notes that two letters from the Journal of Analytical Toxicology were introduced at the hearing (letter to editor, 10 J Analytical Toxicology 125 [1986]; letter to editor, 12 J Analytical Toxicology 168 [1968] [Intoxilyzer 4011AS]). Each indicated the existence of a possible defect in an Intoxilyzer model. The first letter reported a machine malfunction which resulted in a reading on the digital display terminal that differed from the reading on the card. The People’s witnesses indicated that this obviously was a machine that was not functioning properly, since the instrument itself is designed so that it cannot give different readings on the display and printout. All witnesses concurred that it is essential that the Intoxilyzer 5000 be properly maintained.
In a test referred to in the second letter, a work exposure interference was reported. It appeared that a subject was using toluene in a closed area. This resulted in a breath test reading which varied from a blood specimen taken. The People’s witnesses were both familiar with the letter writers, one of whom is the editor of the journal in which the letters appeared. Dr. Flores indicated that it would be virtually impossible for anyone to dupli *769 cate the conditions under which the particular subject worked, stating that the subject was in a very small booth and was using toluene without protective devices of any sort. These conditions resulted in slurred speech, hyperventilation, a distinct odor of acetone on his person, and an unsteady gait. It is of interest to note in this regard that Alfred A. Biasotti, M. S., writing in the Journal of Forensic Sciences, made certain observations regarding the Intoxilyzer. Mr. Biasotti is a manager/criminalist with the California Department of Justice, Bureau of Forensic Services. In discussing a California court’s finding that the Intoxilyzer met the standards of specificity fixed by the California Administrative Code, he stated, "The scientific basis for this finding is that non ethyl alcohol substances that could be present in an expired breath of DUI suspects are so rare, or at such low concentrations as to not significantly affect the quantitation of ethyl alcohol in a breath sample. This is because non ethyl alcohol substances that could exist in the blood of ambulatory subjects are generally much more toxic than ethyl alcohol. Those who have orally ingested intentionally, or accidentally, substances such as methyl alcohol, isopropyl alcohol, gasoline, paint thinner, or other industrial liquids generally become too ill, or comatose, and therefore are unlikely to drive a motor vehicle. The term 'orally ingested’ is important because it has been determined that even prolonged breathing or exposure to noxious atmospheric concentrations of ethanol, acetone, and other industrial solvents does not result in significant concentrations of these substances in the blood.” (Biasotti, The Role of the Forensic Scientist in the Application of Chemical Tests for Alcohol in Traffic Law Enforcement, 29 J Forensic Sciences 1164, 1168 [1984] [ns omitted].) This would apparently explain the results outlined in the aforementioned letters. Witnesses for the People indicated herein that the work exposure interference was a purely isolated incident and that the letters in question gave no explanation as to any other chemical tests that might have been given, nor was this a controlled experiment.