**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**FRANK CARELA, Defendant**

**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**DELROY HENRY, Defendant**

Crim. No. 104/2000, Crim. No. 40/2000

Territorial Court for the Virgin Islands

Division of St. Croix

April 6, 2001

11

■■■ ■■■■■■■■ ■■■

DANIEL MATARANGAS-KING, ESQ., Office of the Attorney General, Christiansted, St. Croix, *Attorney for the Plaintiff*

HAROLD R. WASHINGTON, ESQ., Office of the Territorial Public Defender, Kingshill, St. Croix, *Attorneys for the Defendants*

CABRET, *Presiding Judge*

## MEMORANDUM OPINION

(April 6, 2001)

THIS MATTER is before the Court on Defendants' Motion to Dismiss. These combined cases involve two arrests for driving under the influence, in which the defendants separately challenge the methods used in finding they were intoxicated. The defendants argue that the Horizontal Gaze Nystagmus ("HGN") and the Intoxilyzer 5000 ("Intoxilyzer") tests have not been scientifically validated in the Virgin Islands and, therefore, are not valid bases for their arrests. For the reasons which follow, the defendants' motion will be denied.

### FACTS AND PROCEDURAL POSTURE

Both defendants, Frank Carela ("Carela") and Delroy Henry ("Henry"), were arrested in separate incidents and charged with driving under the influence ("DUI"), in violation of Title 20, Section 493 of the Virgin Islands Code.

Carela was driving without headlights on King Street, Frederiksted, on the night of April 12, 2000. During a traffic stop, police detected a strong odor of alcohol and noted that the defendant was unable to keep his balance after he left his vehicle. Police administered three field sobriety tests—the HGN, the one leg stand and the walk and turn tests—all of

which Carela reportedly failed. Carela was subsequently arrested at 10:20 p.m. and, at 1:04 a.m., was administered the Intoxilyzer breath test, which showed a .24 blood alcohol content.[1]

Police stopped Henry on Lagoon Street, Frederiksted, on January 25, 2000, after noting erratic driving. During the traffic stop, police noted that the defendant had a strong odor of alcohol and staggered when asked to leave the vehicle. Henry was also arrested after failing three field sobriety tests, including the HGN, and was subsequently tested with the Intoxilyzer breath test, which established his blood alcohol content at .21 percent.

Both defendants filed motions to dismiss, in which they challenge the HGN and Intoxilyzer tests as scientifically unreliable methods for a finding of intoxication. These cases were consolidated for the purpose of this motion. The Court held an evidentiary hearing on the motion, during which the Government presented expert testimony on both the HGN and the Intoxilyzer tests.

Dr. Karl Citek ("Dr. Citek")—an optometrist, professor of optometry at Pacific University College of Optomology and researcher in the field—was qualified as an expert to testify regarding the reliability of the HGN, based on his professional training, education, and experience, and substantial peer review publications in the area of vision science and the effects of alcohol and drugs on vision and perception.

Randall Beaty ("Beaty"), an assistant manager of Texas' Breath Alcohol Testing Program and consultant in the field of forensic alcohol testing in the private sector, testified as an expert on the Intoxilyzer 5000. Beaty's curriculum vitae evidences a broad range of education, experience, knowledge, training and peer review publication in forensic alcohol testing and in the technical functioning of the Intoxilyzer, as well as formal education in chemistry and physics.

## DISCUSSION

The admission of scientific or expert evidence is governed by Federal Rule of Evidence 702, which provides:

---

[1] Carela separately challenges the timing of the administration of the Intoxilyzer test as violative of a two-hour time limit specified in Title 20, Section 493c of the V.I. Code. However, in a separate order addressing that issue, the Court denied the defendant's motion to suppress.

13

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ Under this standard, the Court may exercise broad discretion in excluding or admitting scientific evidence. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1175, 143 L.Ed. 2d 238 (1999). However, before admitting expert testimony or scientific evidence, the Court must exercise its gatekeeping role in determining what evidence would help the jury to resolve the issues presented. *See Gov't of the Virgin Islands v. Byers*, 35 V.I. 240, 941 F. Supp. 513 (D.V.I. 1996); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 2789, 2796-97, 125 L. Ed. 2d 469 (1993). In *Daubert*, the Supreme Court set a two-prong test for determining the validity and admissibility of scientific evidence: 1) relevance and 2) reliability. Relevance goes to the helpfulness standard set forth in Rule 702, as determined by the trial court. The reliability prong requires inquiry into the methodology used as a basis for the expert's conclusions, to ensure that it is grounded in good science and based on more than mere "subjective belief or unsupported speculation." *Belofsky v. General Electric Co.*, 980 F. Supp. 818, 821 (D.V.I. 1997); 29 Charles A. Wright & Victor J. Gold, FEDERAL PRACTICE AND PROCEDURE § 6262, at 183 (1997). In making its reliability determination under *Daubert*, however, this Court must consider several factors on the record:

1) whether the theory or technique can be tested or verified;
2) whether the theory or technique has been subjected to peer review and publication;
3) the known or potential rate of error of the technique;
4) the existence of standards controlling the technique's operation; and
5) the general acceptance of the technique in the relevant scientific community.

14

*Daubert*, 509 U.S. at 591-95. In setting these standards, the Court eliminated or, better, elasticized the earlier *Frye*[2] standard which required strict adherence to the "general acceptance" standard. Unlike the earlier general acceptance standard, the above factors are considered as part of a total, flexible inquiry, and no one factor is dispositive. *See Daubert*, 509 U.S. at 594-95; 29 Wright and Gold § 6266 (2000 Supplement). Moreover, the court's inquiry must focus "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594-95.

The Third Circuit has added several other factors which a Court must consider as part of its reliability analysis:

> 1) the relationship of the technique to other methods which have been established as reliable;
> 2) whether the witness is qualified to testify based on the methodology; and
> 3) whether the method has been put to non-judicial use.

*In re Paoli R.R. Yard P.C.B. Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). The Government bears the burden of showing by a preponderance of the evidence that the challenged methods meet the standards for admission of scientific evidence, as outlined above. *See Belofsky*, 980 F. Supp. at 822.

**The HGN Test**

The HGN test measures the effect of alcohol on the ability of the eyes to maintain visual fixation as they are turned. *See* 60 ALR 4th 1129, 1130 (1988). The proper procedures for testing are set by the National Highway Traffic and Safety Administration ("NHTSA"). *Id.*

As Dr. Citek explained, the subject is told to cover one eye and focus on an object held at eye level. As the object is moved toward the ear, the officer watches for involuntary jerks of the eyeballs or the inability to follow the object without turning the head.[3] A police officer on the scene assesses each eye for the following clues of impairment: 1) lack of smooth pursuit or the inability to follow the target at a rate of about 30

---

[2] *Frye v. United States*, 293 F. 1013 (C.A.D.C. 1923).

[3] Tr. at 25.

15

degrees per second; 2) nystagmus[4] at maximum deviation, and; 3) nystagmus at a 45 degree angle.[5] The presence of four of six clues indicates intoxication.[6]

The defendants contend the HGN test cannot be used to support a DUI conviction because its reliability has not been established in this jurisdiction. They also assert that the test is scientific in nature and, therefore, may not be admitted through the lay testimony of a police officer.

In its motion in opposition to the motion to dismiss, the Government argued that the HGN test is used in this jurisdiction in concert with two other field sobriety tests, merely as a tool to allow the officer to observe the suspect's responses and behaviors which may suggest possible impairment warranting further testing, and not as conclusive evidence of intoxication. However, the Government subsequently argued at the *Daubert* hearing that the HGN is also a reliable method of determining a suspect's blood alcohol content ("BAC").[7]

Because the HGN test implicates different standards depending on the use to which it is put, the Court will separately consider the admissibility of that test as an observational tool and as proof of blood alcohol content.

## HGN As Observational Tool

The HGN has traditionally been used to corroborate other evidence of intoxication, and is usually followed by a more conclusive chemical test. *See* 60 ALR 4th 1103, 1132 (1988); *State v. Superior Court*, 718 P.2d 171, 178-81 (Ariz. 1986). As Dr. Citek testified, an officer making a traffic stop generally has some indicators of impairment, such as erratic driving and staggering. This test, therefore, is "only used later on to further establish probable cause that the individual might be impaired."[8] Specifically, in addition to the test battery described above, the officer

---

[4] Nystagmus is a physiological condition manifested by the involuntary, rapid oscillation of the eyes when an individual attempts to follow an object. *See* Mark A. Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test*, 4 AM. JUR. 3D *Proof of Facts* 3d 439 (1989); *State v. Superior Court*, 718 P. 2d 171, 177 (Ariz. 1986).

[5] Tr. at 24-30.

[6] Tr. at 50.

[7] Tr. at 43.

[8] Tr. at 33.

16

looks for clues that the person is unable to stand in an erect posture, listen to instructions, and keep the head still during testing.[9] These are all traits which are readily observable to a layperson and require no expert interpretation.

Admitting the officer's personal observations as circumstantial evidence of intoxication is consistent with the Federal Rules of Evidence, which deem lay witnesses competent to testify to information within their personal knowledge or experience. *See* FED. R. EVID. 602. Admission of such evidence is also consistent with authorities which generally hold that scientific reliability need not be established by expert testimony, where the test results are offered merely to report the officer's observations of the suspect's responses to testing. *See, e.g. State v. O'Key*, 858 P.2d 904 (Or. App. 1993) (holding the HGN is admissible as a field sobriety test and as corroboration of other sobriety tests); *State v. Negal*, 506 N.E.2d 285 (Ohio App. 1986) ("The gaze nystagmus test, as do the other commonly used field sobriety tests, requires only the personal observation of the officer administering it. It is objective in nature and does not require expert interpretation."); *State v. Murphy*, 451 N.W.2d 154 (Iowa 1990) (holding the HGN is admissible through the testimony of police officer, because it reflects the officer's observation); *Superior Court*, 718 P.2d at 177-78 (the HGN test results are generally accepted as the officer's observations and experiences and to support a finding of probable cause); *State v. Taylor*, 694 A.2d 907, 911 (Me. 1997) (holding that the HGN may be introduced as circumstantial evidence of intoxication without a scientific explanation; referring to the HGN as the single most accurate field test if properly done); *accord State v. Cissne*, 865 P.2d 564 (Wash. 1994); 60 ALR 4th 1132.

When used for this purpose, the test relies solely on the officer's observations and interpretation of the suspect's behavior and implicates no scientific principles or methodology. Moreover, this limited use presents no reliability or prejudicial concerns, because the HGN is viewed only as one of several indicators of impairment and is generally followed by more conclusive chemical testing. *See, e.g.* 60 ALR 4th 1103, 1132; *Superior Court*, 718 P.2d at 178.

---

[9] Tr. at 27-28, 34.

Thus, when used merely to report the officer's observations of the defendant's behavior during testing, the HGN is not scientific in nature and may be offered for this limited purpose through the testimony of a police officer.

**HGN to Determine Blood Alcohol Content**

Scientific evidence is "evidence that draws its convincing force from some principles of science, mathematics and the like." *Commonwealth v. Apollo*, 603 A.2d 1023, 1026 (Pa. 1992); *See also Belofsky*, 980 F. Supp. at 822. It implies a grounding in methods and procedures of science, based not on mere subjective belief or unsupported speculation but on "systematized knowledge derived from observation, study, and experimentation." *Daubert*, 509 U.S. at 590; *see also* NEW WORLD DICTIONARY 1275 (2d ed. 1979).

When used for the purpose of estimating BAC, the HGN has been viewed as scientific in nature because it is based on the scientific principle "that consumption of alcohol causes the type of gaze nystagmus measured by the HGN test." *Apollo*, 603 A.2d. at 1025 n. 4, 1026; *see also* Mark A. Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test*, 4 AM. JUR. *Proof of Facts* 3d 439, 456 (1989). Thus, while the HGN is generally acceptable as a field sobriety test, admission of the test as proof of BAC requires a foundation for admitting scientific evidence. *Apollo*, 603 A.2d. at 1025, 1026; *Superior Court*, 718 P.2d at 178-79.

Whether the HGN meets the foundational requirement for admission of scientific evidence is an issue of first impression in the Virgin Islands. However, other courts in this and other jurisdictions have considered this issue and rejected the HGN as a valid scientific method of estimating BAC. *See e.g. Apollo, supra* at 1025-26; *Commonwealth v. Miller*, 532 A.2d 1186, 1189-90 (Pa. 1987) (holding it was error to admit the HGN for the purpose of proving BAC, based solely on the testimony of a police officer, because this constituted scientific evidence); *State v. Reed*, 732 P.2d 66, 68 (Ore. 1987) (holding that the HGN for the purpose of proving BAC is a scientific method, requiring expert testimony); *State v. Wheeler*, 764 S.W.2d 523, 524 (Mo. 1989) (rejecting the HGN to determine BAC); *State v. Bresson*, 554 N.E.2d 1330, 1336 (Ohio 1990) (holding that a police officer could properly testify regarding his observations during HGN testing, but such testimony is insufficient for the purpose of proving BAC, which implicates scientific principles);

18

*State v. Sullivan*, 426 S.E.2d 766, 769 (S.C. 1993) (holding the HGN is appropriately used only in conjunction with other tests, as a way of discerning the objective manifestations of intoxication); *see also Murphy, supra* at 154; *O'Key, supra* at 907 n. 5; *Negal, supra* at 286.

Having considered the testimony presented and the standards for admitting scientific evidence, this Court similarly holds that the HGN is not a scientifically reliable method for determining blood alcohol content.

While the Government properly noted in its brief the limited purpose for which HGN has traditionally been used in this jurisdiction, it attempted to show through expert testimony at the *Daubert* hearing that this test is also a scientifically reliable method for determining blood alcohol content. The Court disagrees and rejects the Government's suggestion that the use of the HGN should be expanded in this jurisdiction as conclusive evidence of intoxication.

Of primary concern is the test's accuracy and potential for error, which "bears heavily on its reliability for evidential purposes." *United States v. Downing*, 753 F.2d 1224, 1234, 1239 (3d Cir. 1985). Accepting the test as conclusive evidence of intoxication necessarily requires that the test be able to stand on its own proof. However, the ability of the HGN to accurately predict BAC has been called into question because of numerous extraneous variables that may affect test results and the imprecise nature of the test. *See* Donald H. Nichols, DRINKING/DRIVING LITIG. PRACTICE § 26 (1994); *Apollo*, 603 A.2d at 1025-26. In *Apollo*, the court rejected expert testimony tending to establish the test as reliable, in the face of national studies indicating a high failure rate among sober patients given the test, and because data regarding the reliability of the HGN have been highly criticized. *See Apollo*, 603 A.2d at 1023, 1026-1027.

At the *Daubert* hearing, the Government's expert conceded that the test is prone to a large margin of error—20 to 23 percent—when used alone.[10] When administered with other field sobriety tests, however, its accuracy is 93 percent, further bolstering the view of the HGN as a complementary test, to be used in a full testing battery rather than as a sole determinant of intoxication. *See* 60 ALR 4th 1103; *Superior Court*,

---

[10] Tr. at 39-40, 50-52.

19

718 P.2d at 181. Also enlarging the potential for error is the fact that 50-60 percent of "normal"[11] individuals will develop nystagmus when the eyes are moved to a lateral extreme, despite the absence of intoxication.[12]

Moreover, the multiple causes of nystagmus and the subjective judgments required of an officer to rule out such factors further call into question not only the test's accuracy, but also its testability and verifiability. As Dr. Citek testified, nystagmus is not only induced by alcohol, but may have at least 40 other causes, including: congenital defects which appear in 10 percent of the population,[13] head injury, trauma, stroke, environmental conditions, prescription drugs, brain tumor, and inner ear problems.[14] Indeed, Dr. Citek noted, "If the prescription drug is in the category of a central nervous system depressant, to which alcohol belongs ... then with enough use of that drug the individual will show exactly the same signs, the same symptoms, as with intoxication with alcohol, and the individual will actually be impaired."[15]

Additionally, Dr. Citek noted that individuals with mid-level amounts of intoxication may experience a condition known as "oscillopsia," in which individuals perceive everything around them as bouncing back and forth.[16] However, this condition is not isolated to intoxication, but may also be an indication of other conditions such as brain tumor, stroke, recent trauma, or even vision problems.[17]

---

[11] Under cross-examination, Citek defined as "normal" those individuals who are sober and not under the influence of alcohol or other central nervous system depressions or any other conditions that would produce the nystagmus in the absence of intoxication. *See* Tr. at 44-45.

[12] Tr. at 29. The test has been noted as unreliable because it generates false positives in individuals who may display nystagmus, even with no blood alcohol content. *See* Rouleau, *supra* at 452.

[13] Tr. at 45.

[14] Tr. at 49. Additionally, other causes have been noted: the common flu, streptococcus infection, vertigo, measles, syphilis, arteriosclerosis, muscular dystrophy, brain hemorrhage, multiple sclerosis, epilepsy, hypertension, motion sickness, sunstroke, eye strain, eye muscle fatigue, glaucoma, as well as caffeine, nicotine or aspirin ingestion. *See* Rouleau, *supra* at 455-56; *see also Apollo*, 603 A. 2d at 1026-1027.

[15] Tr. at 49.

[16] Tr. at 36.

[17] *Id.*

Allowing the HGN to be used to determine BAC, then, would require the officer on the scene to: properly detect the presence of nystagmus, discount nystagmus arising from other factors, calculate the correct point of onset[18] of nystagmus and, from that data, estimate the suspect's blood alcohol content. Dr. Citek reasoned that the officer administering a test should be able to easily discern when the nystagmus is caused by other physiological conditions rather than by alcohol, based on how the involuntary jerking appears and how long it persists during testing.[19] He testified that nystagmus from other causes persists no longer than two seconds and would result in unequal jerking of each eye.[20] Thus, in order to remove the possibility of other causes, the officer must test for at least four seconds and ensure that the jerking is equally present in both eyes.

The court finds these propositions unsettling for several reasons. First, this process undoubtedly requires reliance on a series of subjective determinations, inviting error at every turn, and thrusts the officer dangerously close to making medical diagnoses in the field. This is exactly the kind of subjectivity that Federal Rule of Evidence 702 and the *Daubert* factors are intended to weed out. *See Henry v. Hess Oil Virgin Islands Corp.*, 33 V.I. 163, 163 F.R.D. 237 (D.V.I. 1995) (The trial judge must ensure that the methods used by the proffered expert are based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation.") (quoting *Daubert*, 509 U.S. at 589; *Paoli*, 35 F.3d at 742).

Additionally, the Court questions the prudence of placing complete reliance on a broad assumption that every individual with non-alcohol induced nystagmus will react the same in each instance, ensuring that those cases will be properly detected by non-medical personnel. Such reliance is particularly questionable, given the recognition that numerous other factors, including even caffeine and nicotine use, may produce responses strikingly similar to those associated with alcohol impairment.[21]

---

[18] The angle of onset purportedly correlates to a blood alcohol content, with a 45 degree angle representing about 5 percent BAC.

[19] Tr. at 29, 58.

[20] Tr. at 29-30, 63-64.

[21] Tr. at 149; *see also* Rouleau, *supra* at 455-56.

21

Testability is the touchstone of methods grounded in science and is, in fact "what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593 (citations omitted). Therefore, scientific procedures must necessarily be administered according to set standards which allow the results to be replicated and verified for accuracy. *See Gov't of the Virgin Islands v. Penn*, 838 F. Supp. 1054 (D.V.I. 1993); *see also Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1208 (6th Cir. 1988) (Scientific methods are equated with "demonstrable, objective procedure(s) for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts."). In addition to its great likelihood of generating faulty results due to misdiagnoses of the particular cause of nystagmus, however, the HGN fails to satisfy *Daubert*'s first and fourth prongs, because of the apparent impossibility of replicating or verifying test results and the absence of set standards controlling its administration.

First, the determination of BAC is pegged at the point of onset of nystagmus—that is, the angle at which the involuntary jerking begins. The officer must, therefore, estimate the angle of onset and then determine the BAC that correlates with that angle. Because the BAC ultimately depends on the angle of onset, a correct determination of this point is critical to accurate findings. However, the method is anything but precise. Once the test is concluded, there is no record of how the suspect was positioned or the exact point of onset. Thus, there is no way to verify the point of onset to test the accuracy of the officer's determinations, to confirm that the angle was properly determined, or to verify the officer's conclusion regarding the correlating BAC. In fact, Dr. Citek presented no testimony evidencing the existence of a precise method of determining such angles, in order to ensure accuracy and consistency in each administration of the test.

Furthermore, the Court notes that there was no evidence to establish that officers in the territory have been trained to properly approximate the angle of onset or what measures, if any, would be available to verify that calculation. While Citek opined that officers can be so trained, he also acknowledged under cross-examination concerns in the scientific community that officers, in all likelihood, cannot be trained to properly

calculate the point of onset and the correlating BAC.[22] Without any way to record the testing procedure or to identify the exact positioning or angle of onset, and without further guidance in the field to ensure that there are consistent methods for identifying the point of onset, the use of the HGN to determine BAC would represent a rough estimate, at best, and an imprecise stab in the dark, at worst. Needless to say, this testing method leaves too much room for subjectivity and error and would lead to too tenuous a correlation to BAC—neither of which has any place in the criminal law. *See Superior Court*, 718 P.2d at 181 (Accepting the test for proving BAC presents due process problems in criminal cases, because of the inability to independently replicate the results, its large margin of error, and the other causes of nystagmus; therefore, the HGN should not be used in lieu of more accurate chemical tests which are available to prove intoxication.).

Science, by its very nature, implicates the ability to test and verify results. *See Daubert*, 509 U.S. at 593. Therefore, because the HGN test relies so heavily on personal observations, perceptions, and proper diagnoses of other causes of nystagmus, it lacks the objectivity inherent in scientific methodology and, therefore, cannot pass muster as a reliable method of correlating nystagmus to blood alcohol content under *Daubert* and *Paoli*.

Citek's testimony and the case law on this issue clearly establish that the principles underlying the HGN method, as well as his opinions, have been reviewed in innumerable peer review publications.[23] However, while there is no question that the HGN has been generally accepted as an appropriate field sobriety test, the Government has not shown that the test has been embraced in the relevant scientific community as a reliable method of proving intoxication.

Dr. Citek testified that the method has been generally accepted and presented a 1993 resolution of the American Ophthalmologist Association accepting the test as a "scientifically valid and reliable tool for trained police officers to use *in field sobriety testing*."[24] However, notwithstanding that endorsement, this Court is unconvinced that the test has

---

[22] Tr. at 41, 48.

[23] Tr. at 7-14, 40-41.

[24] Tr. at 43.

enjoyed—or should enjoy—broader acceptance as a reliable test for determining blood alcohol content, given the concerns noted regarding its potential for error, lack of objective testing methods, and the inability to validate the results.

■ Accordingly, the Court finds that the HGN test is admissible as circumstantial evidence of intoxication when used for the purpose of reporting the suspect's responses, as observed by a police officer. A layperson is certainly capable of observing the behavior of another individual and concluding, based on his experiences, that those reactions suggest impairment. However, that is where the usefulness of this test ends. Attempts to then correlate the suspect's performance on the test to the level of blood alcohol content requires the application of scientific principles and reliable methodology, which the Government has not established. Therefore, for the reasons earlier stated, the Court concludes that the HGN is not a reliable method of determining BAC.

### Intoxilyzer 5000

The Intoxilyzer 5000 is a portable, automated machine which determines BAC by examining how different compounds interact with light. See Nichols, *supra* at § 29. An infrared red light is shined through a sample, tube-like chamber.[25] The suspect's breath sample is then introduced into the chamber. Any alcohol in one's breath will absorb the infrared energy in amounts proportionate to the amount of alcohol in the breath sample.[26] This method is based on the principle that molecules absorb electromagnetic radiation of certain wavelengths and that vaporized alcohol will absorb infrared light at different wavelengths than other compounds.[27]

To get an accurate BAC reading, the suspect is required to provide a sample of deep lung air, rather than breath from the mouth which could exaggerate the results. In this regard, officers are trained to wait 20 minutes after encountering the suspect before administering the test to guard against improperly testing mouth air.[28] Additionally, the subject is

---

[25] Tr. at 94.

[26] Tr. at 95-96.

[27] *Id.*

[28] Tr. at 99, 112.

instructed to blow at a sufficient pressure to activate the pressure switch, and keep the required pressure for at least 4-5 seconds until the instrument is satisfied that the rate of change in alcohol concentration has leveled off.[29]

Unlike the HGN, the Intoxilyzer 5000 is used in this jurisdiction to provide conclusive evidence of intoxication, based on a specified blood alcohol content. However, while this method of determining blood alcohol content has been in use for many years, its reliability has not previously been validated in the Virgin Islands. This, the defendants argue, preponderates in favor of dismissal.

It is undisputed that the Intoxilyzer is a scientific method, grounded in principles of chemistry.[30] *See Commonwealth v. Smyth*, 502 N.E.2d 162, 163-64 (Mass. 1987); *People v. Summa*, 531 N.Y.S.2d 993 (1988). Therefore, the only question is whether it meets the standards of reliability under *Daubert* and *Paoli*.

The Intoxilyzer has enjoyed wide acceptance as a valid measurement of intoxication since being patented in 1986. *See California v. Trombetta*, 467 U.S. 479, 488-91, 104 S. Ct. 2528, 2534 at n. 9, 10, 81 L. Ed. 2d 413 (1984) (noting the proven accuracy of the Intoxilyzer); *Summa*, 531 N.Y.S.2d at 994-96; *Lattarulo v. State*, 401 S.E.2d 516 (Ga. 1991). Indeed, the National Highway Traffic and Safety Administration ("NHTSA") has endorsed the Intoxilyzer 5000 device as a reliable method of determining intoxication. That model appears on NHTSA's Conforming Products List of Evidential Breath Measurement Devices.[31] Devices appearing on that list have been tested to ensure compliance with model specifications which are also established by that agency. *See* Nichols, at §§ 27:17, 29.

Additionally, the Intoxilyzer has been widely reviewed and accepted in the scientific community as a valid method of determining BAC. This is evidenced by the wide range of peer review publications considering the scientific principles underlying the Intoxilyzer method and the functioning of the test in particular.[32]

---

[29] Tr. at 114.

[30] *See* Tr. at 125-26.

[31] Tr. at 107; *see also* 49 FED. REG. 48854 (1991).

[32] Nichols, *supra* at §§ 22, 27; *see also* Tr. at 108-09.

Moreover, while the Intoxilyzer has been used primarily in drunk driving litigation, Beaty testified that its acceptance now extends beyond the judicial context, to employment and hospital emergency room settings.[33] Such widespread acceptance may be weighed heavily in favor of admissibility. *See Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community ... may properly be viewed with skepticism.") (internal quotations and citations omitted). The Intoxilyzer's broad acceptance, in both the scientific and judicial communities, is further evidence that the methodology has been subjected to peer review and an affirmance that it is, in fact, viewed approvingly within the relevant scientific community.[34]

With regard to the potential for error, Beaty noted that the Intoxilyzer 5000 maintains a margin of error of just 3 to 5 percent which, he notes, is well within industry standards and exceeds any of NHTSA's regulations.[35] This Court takes judicial notice of expert testimony by NHTSA in an earlier case, which established the accepted industry margin of error for the Intoxilyzer at four to five percent. *See Summa*, 531 N.Y.S.2d at 995 (testimony by Dr. Arthur Flores, Project Director for NHTSA's Office of Alcohol Countermeasures); *Lattarulo*, 401 S.E.2d at 519 (noting that a trial court may judicially notice a method which has been recognized in a substantial number of courts); *see also United States v. Downing*, 753 F.2d 1224, 1239 (3d Cir. 1985) (holding that the court may judicially notice expert testimony in other cases in making its reliability determination); *accord Byers*, 941 F. Supp. at 515 n. 4.

Additionally, the test's design and operations help to guard against extraneous factors affecting its accuracy, further assuring that this error rate is maintained. Significantly, the test is specific to ethanol and will, therefore, be unaffected by the presence of other substances or conditions, thereby reducing the possibility of false positives.[36] Beaty

---

[33] Tr. at 107-109.

[34] Tr. at 107.

[35] Tr. at 99, 109-110.

[36] Tr. at 108.

noted that, unlike alcohol, "other drugs say like barbiturates, cocaine, and other narcotics are not volatile in nature in that they will not evolve into the breath. And since they are not in the breath, they cannot be analyzed by the Intoxilyzer 5000 so it will not test for other drugs."[37] Moreover, while the device may detect other substances such as acetone and methanol, the device is aptly equipped with safeguards to detect these substances and invalidate the test.[38]

Indeed, the device is equipped with internal safeguards to detect any other external factors which may potentially affect test results, thus ensuring its reliability and accuracy. These include checking for building frequencies which may cause interference and produce erroneous results, proper calibration, appropriate room air, and a proper breath sample which will yield correct results (i.e. deep lung air versus mouth air).[39] The machine automatically checks for these conditions or interferences before beginning the test and, if external factors are detected, the device invalidates the test and does not allow the operator to proceed.[40]

Moreover, the fact that the test is fully automated with little, if any, operator influence, is an additional safeguard to prevent extraneous variables (i.e. operator errors) from entering the test.[41] In this regard, Beaty noted that once the device is started, the operator "cannot jump around in the test sequence."[42] Additionally, the operator is not relied upon to ensure proper testing conditions, because the instrument runs a diagnostic test and checks to make sure the internal parameters are appropriate for testing. This diagnostic sequence also includes checking for proper calibration, which alerts the operator and invalidates the test if calibration is off by more than 5 percent.[43] Again, if anything is detected which could possibly influence the accuracy of the test, the instrument is designed to invalidate the test and produce an output card notifying the

---

[37] Tr. at 108.

[38] Tr. at 122.

[39] Tr. at 99-105, 114.

[40] Tr. at 99-101.

[41] Tr. at 99-106.

[42] Id.

[43] Tr. at 135.

operator of the condition.[44] The relative inability of the operator to manipulate the test sequence or its operation, and the absence of any subjective determinations in the testing process undoubtedly enhance its accuracy.

The Intoxilyzer test also satisfies *Daubert's* testability prong. The scientific theory underlying the Intoxilyzer—infrared spectroscopy—has been extensively tested and established "as an accurate means of quantification of chemicals."[45] In addition to the testability of the underlying scientific theory, the test and the working conditions of the device may also be verified in each instance. The test results are printed on an output card[46] and can, therefore, be replicated and verified through the use of a simulated test.[47] This test, termed a "wet bath simulator," [sic][48] entails the use of an alcohol and water solution with a known quantity of ethanol, which is then introduced into the machine to confirm the predicted results.[49] Because the alcohol content is a known variable, this simulation allows the working condition and accuracy of the device to be verified. If properly calibrated and in working order, the test should produce consistent results with each administration.

---

[44] *Id.*

[45] Tr. at 108-09.

[46] In their briefs, Defendants initially argued that they were denied due process because the breath sample was not preserved. This argument has long been rejected by the U.S. Supreme Court, which held that the fact that a breath sample is not saved is not fatal to the test's admissibility and does not amount to a denial of due process. *See Trombetta,* 467 U.S. at 491 (holding there is no due process violation if the sample is not preserved because of the test's proven accuracy). Therefore, this Court finds no merit in the defendants' assertions that dismissal is warranted on this basis.

[47] Tr. at 131, 149. The Court also takes judicial notice of expert testimony in *Summa,* which points to extensive testing of the Intoxilyzer 5000 device for proper power input, calibration, accuracy and consistency in testing, as well as the device's responses to other substances, to ascertain and rule out the potential for error. *See Summa,* 531 N.Y.S. 2d at 995-96.

[48] The Court notes that this verification test has been referred to as a Breath Alcohol Sample Simulator, or BASS. *See Summa,* 531 N.Y.S. 2d at 995.

[49] Tr. at 82, 128-30.

## CONCLUSION

◼ The Government has met its burden of showing that the Intoxilyzer is a sufficiently reliable method of determining blood alcohol content. However, the Court finds that the Government has failed to establish the reliability of the HGN in estimating blood alcohol content and, therefore, rejects that test as conclusive evidence of intoxication. The HGN will only be admitted for the limited purpose of introducing the defendants' behavior during testing as circumstantial evidence of impairment. An appropriate order will issue.